## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MaineGeneral Medical Center,<br>35 Medical Center Parkway<br>Augusta, Maine 04330<br><br>    *Plaintiff,*<br><br>v.<br><br>Carole Johnson, in her official capacity as<br>Administrator, Health Resources and Services<br>Administration,<br>5600 Fishers Lane, Rockville, Maryland 20852<br><br>and<br><br>Xavier Becerra, in his official capacity as Secretary,<br>United States Department of Health and Human<br>Services,<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201<br><br>    *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: _____ |

## COMPLAINT

Plaintiff MaineGeneral Medical Center by and through its attorneys, Hall, Render,

Killian, Heath & Lyman, P.C., brings this Complaint against Carole Johnson, in her official

capacity as Administrator, Health Resources and Services Administration, and Xavier Becerra, in

his official capacity as Secretary, United States Department of Health and Human Services, and

allege as follows:

1

## PRELIMINARY STATEMENT

1.      This is an action for declaratory relief and for injunctive relief enjoining a recent action

by the Health Resources & Services Administration ("**HRSA**").  On June 19, HRSA unlawfully

authorized a certain manufacturer that participates in the drug pricing program authorized under

Section 340B of the Public Health Service Act ("**340B Program**") to audit Plaintiff's

confidential business records.

2.      Under the 340B Program, a limited set of authorized safety-net providers called "**covered**

**entities**" are guaranteed an opportunity to purchase outpatient drugs at reasonable prices in order

to stretch scarce federal resources available to provide care to underserved communities.

3.      In effect, the 340B Program limits the extent to which drug manufacturers can use

government-granted rights, including patent protections and periods of exclusivity, to divert

funds from the healthcare safety net to enhance their profits.

4.      Drug manufacturers voluntarily participate in the 340B Program because doing so allows

the Medicare and Medicaid programs to reimburse providers when they use the manufacturers'

drugs.

5.      The statute authorizing the 340B Program, 42 U.S.C. § 256b ("**340B Statute**"), grants

participating manufacturers a limited right to audit covered entities' records.

6.       In performing an audit, the Statute requires that manufacturers "act[] in accordance with

procedures established by the Secretary relating to the number, duration, and scope of audits".

42 U.S.C. § 256b(a)(5)(C).

7.      Covered entity records subject to audit are those "that directly pertain to the entity's

compliance with the requirements described in subparagraphs 2 (A) or (B) [of the 340B Statute]

with respect to drugs of the manufacturer." *Id.*

8.      Subparagraphs 2 (A) and (B), respectively: a) prohibit a covered entity from obtaining 340B Program pricing when the manufacturer pays a Medicaid fee-for-service program rebate for the same drug (called a "**duplicate discount**"); and b) prohibit a covered entity from reselling or otherwise transferring a 340B-priced drug to anyone other than its own patient (called "**diversion**").

9.      The procedures governing manufacturer audits referenced in the 340B Statute were established when, between 1994 and 1997, the Secretary followed procedures consistent with those required for informal rulemaking under the Administrative Procedure Act ("**APA**") to promulgate "**Manufacturer Audit Guidelines**." *See* 5 U.S.C. § 553.

10.     In 1994, the Secretary published a "Notice" that contained "proposed manufacturer audit guidelines" and invited members of the public to comment on them for a period of 30 days.  59 Fed. Reg. 30,021, 30,022 (Jun. 10, 1994).

11.     In 1996, the Secretary published a "**Final Notice**"  that included the "final program guidelines concerning manufacturer audit guidelines[.]"  61 Fed. Reg. 65,406 (Dec. 12, 1996).

12.     The Final Notice has the procedural hallmarks of an APA rule, including a summary of and response to 12 public comments received by the Secretary and an effective date 30 days after the Final Notice's publication date.  *Cf.* 5 U.S.C. §§ 553(c), 553(d).

13.     The Manufacturer Audit Guidelines set thresholds that a manufacturer must meet before an audit is permitted.

14.     First, the manufacturer must notify a covered entity in writing when it believes that the covered entity has violated provisions of the 340B Statute.  61 Fed. Reg. at 65,410.

15.     Then, the Guidelines require that the manufacturer work in good faith with the covered entity for at least 30 days, seeking to resolve the issue.  *Id.*

16.     Finally, "[i]f the matter is not resolved and the manufacturer desires to perform an audit," it must submit an audit work plan, a clear description of why it believed a duplicate discount or diversion has occurred, and facts and evidence supporting this belief.  *Id.*

17.     This procedure limits the scope of audits to issues which cannot be resolved through good-faith engagement between a manufacturer and a covered entity.

18.     If HRSA finds that there is reasonable cause to believe that duplicate discounts or diversion have occurred, it "will not intervene." *Id.*

19.     On June 19, 2024, HRSA approved a manufacturer's request to audit Plaintiff's confidential business records.

20.     The manufacturer never notified Plaintiff in writing that it believed Plaintiff violated the 340B Statute.

21.     Plaintiff asked HRSA to reconsider its audit approval decision and to provide Plaintiff with copies of documents it relied on in making its decision.

22.     HRSA denied these requests.

23.     Plaintiff has been denied the opportunity to understand and potentially resolve the manufacturer's concerns without undergoing an intrusive audit.

24.     HRSA therefore approved an audit that is outside the scope of audits permitted under the 340B Statute and the Manufacturer Audit Guidelines.

25.     Plaintiff seeks a declaration that the Manufacturer Audit Guidelines are both binding and mandatory with respect to manufacturers and the Secretary.

26.     Plaintiff also seeks to enjoin the Secretary from allowing the audit to proceed and to enjoin Secretary from removing Plaintiff from the 340B Program or taking any other action

against Plaintiff for any alleged failure to respond to the manufacturer's premature, burdensome, and unlawfully approved audit demands.

## JURISDICTION

27.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 28 U.S.C. § 1361, in that this is an action to compel officers of the United States to perform their duty; and 28 U.S.C. §§ 2201–2202, in that there exists an actual justiciable controversy as to which Plaintiff requires a declaration of its rights by this court and injunctive relief to prohibit Defendants from violating federal law.

## VENUE

28.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (e) because this is a civil action in which Defendants are officers of the United States acting in their official capacities and one of the Defendants maintains his office and conducts business in this judicial district.

## PARTIES

29.     Plaintiff MaineGeneral Medical Center is a Maine non-profit corporation with its principal place of business at 35 Medical Center Parkway, Augusta, Maine.  It operates a rural Sole Community Hospital of the same name with 198 in-patient beds and has participated in the 340B Program for more than 15 years.

30.     Defendant Xavier Becerra is the Secretary of Health and Human Services.  Defendant Becerra maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201, and is sued in his official capacity only.

31.     Defendant Carole Johnson is the Administrator of the Health Resources and Services
Administration, an operating division within the Department of Health and Human Services.
The Administrator maintains an office at 5600 Fishers Lane, Rockville, Maryland 20852.  The
administrator is sued in her official capacity only.

## BACKGROUND ON THE 340B PROGRAM

**The 340B Program**

32.     Congress created the 340B Program in 1992 to address rapidly increasing drug prices
faced by safety-net hospitals and grant-funded clinics.   Veterans Health Care Act of 1992, Pub.
L. 102-585 (Nov. 4, 1992); H.R. Rep. No. 384, 102d Cong., 2d Sess. Pt. 2 at 10-12 (1992).

33.     The 340B Program permits covered entities to purchase certain drugs at the same rate that
state Medicaid programs pay.  *See generally* 42 U.S.C. § 256b(a)(1) (referencing the "average
manufacturer price" under Title XIX of the Social Security Act); *see also* 42 U.S.C. § 1396r-8
(establishing the Medicaid Drug Rebate Program under which manufacturers pay rebates to state
Medicaid agencies).

34.     The 340B Statute itself is uncomplicated, spanning only five pages of the printed United
States Code.  42 U.S.C. § 256b (2022).  Among other things, it defines the safety-net entities that
are eligible to participate in the 340B Program (again, "**covered entities**"), *id.* § 256b(a)(4);
prohibits them from engaging in "duplicate discounts" and "diversion," each as defined above,
*id.* §§ 256b(a)(5)(A)-(B); and establishes penalties for violations.  *Id.*, §§ 256b(a)(5)(D),
256b(d)(2)(B)(v).

35.     The 340B Statute also creates a limited audit right for the Secretary and participating
manufacturers.  It states:

> A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug…**(acting in accordance with acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits)** to audit at the Secretary's or manufacturers expense the records of the covered entity that directly pertain to the entity's compliance with [the duplicate discount and diversion prohibitions] with respect to drugs of the manufacturer.  42 U.S.C. § 256b(a)(5)(C) (emphasis added).

**The Manufacturer Audit Guidelines**

36.    Through a process consistent with the APA's requirements for informal rulemaking, HRSA published Manufacturer Audit Guidelines in 1996. 61 Fed. Reg. 65,406 (Dec. 12, 1996); 59 Fed. Reg. 30,021(Jun. 10, 1994) (issuing proposed guidelines and opening a 30-day public comment period).

37.    HRSA invoked § 256b(a)(5)(C) when it published the Guidelines.  61 Fed. Reg. at 65,406.

38.    The Manufacturer Audit Guidelines set thresholds that any manufacturer wishing to audit a covered entity must pass.  61 Fed. Reg. at 65,410 ("Procedures To Be Followed").

39.    These thresholds are not particularly taxing, but they are important.

40.    Prior to auditing a covered entity, a manufacturer must "notify the entity in writing when it believes the entity has violated provisions of section 340B."  61 Fed. Reg. at 65,410.

41.    The notice triggers a mandatory 30-day period in which the parties "attempt in good faith to resolve the matter." *Id.*

42.     If, and only if, the good-faith attempt fails, the manufacturer may inform HRSA that it intends to audit the entity.  *Id.*

43.     Under the Guidelines, "[a] manufacturer shall conduct an audit only when it has documentation which indicates that there is reasonable cause."  *Id.*

44.     Before conducting an audit, the manufacturer is required to provide HRSA with: (i) an audit work plan; (ii) "a clear description of why it has reasonable cause to believe that ta violation of section 340B(a)(5) (A) or (B) has occurred," which must be supported by "sufficient facts and evidence[;]" and (iii) "copies of any documents supporting its claims."  *Id.*

45.     HRSA reviews these materials to determine if "reasonable cause" exists.  *Id.*

46.     "'Reasonable cause' means that a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5) (A) or (B)[.]"  *Id.* at 65,409.

47.     If HRSA finds that the documentation provided by the manufacturer shows reasonable cause, it "will not intervene[,]" *id.* at 65,410, and the covered entity is required to participate in the audit.

48.     Unless it receives written notice from a manufacturer, a covered entity has no way of knowing what facts HRSA considered when determining that "reasonable cause" exists.

49.     In 1996, a commenter asked that covered entities be allowed to respond to a manufacturer's request for an audit.  61 Fed. Reg. at 65,408.  HRSA demurred:

> The guidelines provide for a 30 day period before the manufacturer submits to the Department an audit work plan in which the manufacturer and the covered entity must attempt in good faith to resolve the matter.  When the manufacturer submits its audit work plan, it has already discussed the matter with the covered entity;

> therefore, we do not believe there is a need for the covered entity
>
> to comment on a manufacturer's submission of an audit workplan.
>
> The Department, at its discretion, may contact the covered entity as
>
> part of the review process of the proposed manufacturer's audit.
>
> Likewise, we do not believe that there is a need for the covered
>
> entity to review and comment on the manufacturer's proposed
>
> workplan once it has been reviewed by the Department.  61 Fed.
>
> Reg. 65,408.

50.     Thus, written notice of a diversion or duplicate discount violation is vital to the manufacturer audit process, including because it is the only way that the covered entity is able to participate in good faith to resolve the matter within the 30 day period.

51.     Since HRSA reviews and approves manufacturers' audit work plans and reasonable cause documentation on an *ex parte* basis, written notice is a covered entity's only protection against frivolous or vexatious audits.

### PROCEDURAL HISTORY OF THE CHALLENGED AUDITS

52.     On April 22, 2024, Plaintiff received an unsigned email from Johnson & Johnson ("**J&J**") requesting a meeting to discuss the Plaintiff's 340B program.

53.     As to scope, the message stated that J&J "would like to discuss and ask questions regarding your entity's 340B utilization."  Email from 340B_JJHCS@its.jnj.com to J. Kent of MaineGeneral (Apr. 22, 2024) (**Exhibit 1**).

54.     MaineGeneral responded to J&J's initial email within 90 minutes.

55.     MaineGeneral sent a substantive response to J&J on May 2.

56.     Within a week, the parties agreed to a meeting on May 15.

57.     Throughout the course of these communications, J&J asked questions and provided few, if any, answers.

58.     Plaintiff never received a written statement from J&J stating that it believed Plaintiff had engaged in diversion or duplicate discounts.

**Deloitte & Touche Contacts Plaintiff**

59.     On June 20, 2024, Plaintiff received a letter from Deloitte & Touche, LLP ("**Deloitte**") explaining that HRSA had approved J&J's request to audit Plaintiff just one day earlier—June 19, a Federal holiday (**Exhibit 2**).

60.     Deloitte's letter further explained that pursuant to the Manufacturer Audit Guidelines, J&J had engaged Deloitte to perform the audit.

61.     Enclosed with the letter was a document request list demanding access to voluminous, confidential records held by Plaintiff relating to its patients, employees, business operations, and clinical operations (**Exhibit 3**).

62.     Deloitte's letter asked Plaintiff to make itself available for a call during the week of June 24—the Monday following the date Plaintiff received Deloitte's letter.

63.     Deloitte's letter also asked Plaintiff to compile all of the requested documents by July 5.

64.     The requested documents include patients' HIPAA-protected health information, personally identifiable information for many of Plaintiff's employees and other providers, and contracts and other business records that would require legal review and redaction.

65.     On June 28, Plaintiff, through undersigned counsel, sent a responsive letter to Deloitte contesting the validity of HRSA's audit approval (**Exhibit 4**).

66.     By this letter, Plaintiff requested that Deloitte provide a copy of J&J's written notice to the Plaintiff, J&J's audit work plan, and a "reasonable cause" letter to HRSA referenced in Deloitte's June 20 communication.

67.     Plaintiff also asserted that, if the proposed audit were to move forward, Deloitte or J&J would need to provide reasonably tailored information related to the audit process.

68.     On July 8, counsel for J&J offered to provide the information Plaintiff requested if Plaintiff would agree to keep the information confidential (**Exhibit 5**).

**HRSA's Final Agency Action**

69.     On June 26, a HRSA official contacted Plaintiff and confirmed that it approved J&J's requested audit (**Exhibit 6**).  The communication specifies:

> After careful review, HRSA determined that J&J met the thresholds identified in HRSA's Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406 (Dec. 12,1996) and Clarification of Manufacturer Audits of 340B Covered Entities, 340B Drug Pricing Program Notice 2011-3 (Nov. 21, 2011) in order to pursue an audit, as defined in section 340B(a)(5)(A) of the Public Health Service Act.  *Id.*

70.     On June 28, undersigned counsel contacted HRSA on behalf of Plaintiff and requested that HRSA reconsider its decision to approve J&J's proposed audit (**Exhibit 7**).

71.     Plaintiff asserted that J&J had failed to notify it in writing that it believed Plaintiff had violated the 340B Statute.

72.     Plaintiff requested that HRSA provide it with J&J's "reasonable cause" letter, audit work plan, and supporting documents.

73.     On July 10, HRSA sent a letter denying Plaintiff's request to reconsider the audit approval and denying its request for documentation (**Exhibit 8**).

74.     As to the lack of written notice, HRSA stated that it had considered the "good faith timelines" applicable to Plaintiff when making its initial—and now final—decision to approve J&J's requested audits.

75.      HRSA also denied Plaintiff's request to produce documents, offering two alternatives: request them from J&J or submit a Freedom of Information Act request.

**HRSA's Audit Approvals are Unlawful**

76.     HRSA's decision to approve J&J's proposed audit of Plaintiff is unlawful.

77.     The 340B Statute permits a manufacturer to audit a covered entity only "in accordance with procedures established by the Secretary relating to the scope, duration, and number of audits[.]" 42 U.S.C. § 256b(a)(5)(C).

78.     HRSA specifically invoked subparagraph (C) when it published the final Manufacturer Audit Guidelines in 1996. 61 Fed. Reg. at 65,406.

79.     The Manufacturer Audit Guidelines are the "procedures" mandated by Congress.

80.     The Guidelines provide that the manufacturer "shall" notify the covered entity in writing, and that the manufacturer and covered entity "shall have at least 30 days" to attempt to resolve the dispute in good faith.  61 Fed. Reg. at 65,410.

81.     This procedure limits the scope of manufacturers' audits to issues that cannot be resolved through good-faith engagement between manufacturers and covered entities

82.     The Manufacturer Audit Guidelines are legally binding upon manufacturers and covered entities.

83.     HRSA has a duty to enforce the Manufacturer Audit Guidelines.

84.    Thus, the written notice and good-faith attempt procedure is mandatory.

85.    HRSA's decision to approve J&J's audit request despite its failure to adhere to the notice and good-faith attempt procedure is a final agency action subject to judicial review.

86.    As demonstrated by HRSA's July 10 letter, HRSA's approval decision is final.

87.    Unless the Court intervenes, Plaintiff must comply with the manufacturer's audit demands.  *See* 61 Fed. Reg. at 65,409.

88.    HRSA's decision will cause Plaintiff immediate and irreparable harm.

89.    Deloitte's auditors set an aggressive audit timeline, demanding voluminous sensitive documents in the minimum time allowed by the Manufacturer Audit Guidelines.  *Id.* at 65,410 ("The covered entity will have at least 15 days to prepare for the audit.").

90.    When Plaintiff asked HRSA for more time to respond, it was directed to ask J&J for an extension.

91.    Setting aside any consequences it may face if the audit reveals noncompliance, Plaintiff would expend substantial resources simply collecting the requested materials, armed only with suspicions about what J&J may believe it will find.

92.    The harm to Plaintiff will also be irreparable, including likely damage to Plaintiff's reputation among the public and other 340B Program stakeholders and inevitable damage to its legal standing in any challenge to J&J's audit findings.

93.    J&J has strong business interests in limiting the 340B Program.  J&J's 2023 annual investor report coyly stated that limiting covered entities' access to 340B drugs "had discount implications which positively impacted sales to consumers in 2023."  Johnson & Johnson, Form 10-K for 2023, p. 38.  J&J has also identified 340B utilization as a risk to its bottom line.  *Id.*, p. 10.

94.     On its website, J&J has accused covered entities of using "arbitrage, opportunism, and opacity" to "reap significant financial windfalls" from the Program.  Johnson & Johnson Innovative Medicine, *The 340B Program* () (last accessed July 18, 2024).

95.     In 2023, J&J took the unusual step of filing an *amicus curiae* brief with a federal district court, injecting itself into APA proceedings between a covered entity and HRSA.

96.     In its brief, J&J alleged that "[t]oo many covered entities, like [the plaintiff in the case], abuse the program, pursuing profits by systematically engaging in diversion." *Genesis Healthcare Inc. v. Becerra*, D.S.C. Case No. 4:19-cv-01531-RBH, *Brief of the Janssen Pharmaceutical Companies as Amici Curiae in Support of Defendants' Motion for Summary Judgment*, at 8 (Dkt. No. 121) (hereinafter "**J&J's Amicus Brief**").

97.     Indeed, J&J's Amicus Brief amounted to 34 pages of vitriol in which it accused the plaintiff in that case and other covered entities of "abuse" at least eight times.  J&J stated that it believed covered entities engage in "widespread abuse and exploitation of the 340B program" enabled by "HRSA's failings…and lax enforcement generally[.]"  *Id.* at 8-9.

98.     Although the court wisely decided to rely only on facts and arguments in the administrative record, *see* Text-Only Order of August 23, 2023 in the same case, it still allowed J&J's Amicus Brief to be filed in its entirety, without redaction.  It is available on PACER for $3.00.

99.     Ultimately, and notwithstanding J&J's involvement, the court ruled in the covered entity's favor, overturning HRSA's unlawfully rigid interpretation of the 340B Statute.

100.    Given J&J's failure to follow the good-faith engagement procedure, its stated interest in diminishing 340B utilization, and its history of publicly accusing covered entities of 340B

Program abuse, Plaintiff reasonably believes that J&J will misuse the audit process to further its own pecuniary interests and publicly damage Plaintiff's reputation.

101.    Even if J&J never vilifies Plaintiff in public, drug manufacturers talk to one another about covered entities' involvement in 340B Program, giving J&J ample opportunity to disparage Plaintiff to other manufacturers.

102.    Like at least 35 of its competitors, J&J uses a platform called "340B ESP" to administer its 340B contract pharmacy restriction policies.  Johnson & Johnson, *Notice to 340B and Non-340B End Consumers Regarding Updates to 340B Delivery Limitations*, at 4 (Feb. 15, 2023) (https://340besp.com/JJHCS%20Notice%20to%20End%20Customers%20Regarding%20Updates%20to%20340B%20Delivery%20Limitations.pdf) (last accessed July 18, 2024).

103.    In May 2023, the consultancy behind 340B ESP hosted a 340B Industry Roundtable where attendees would "have the opportunity to network and collaborate with other leading industry stakeholders on a variety of 340B-related themes" and engage in "[s]olutions-oriented discussions proctored by an antitrust attorney."  Berkeley Research Group, *Agenda for 2023 340B Industry Roundtable,* (available via Berkeley Research Group website at https://media.thinkbrg.com/wp-content/uploads/2023/04/10152706/340B-Workshop-Program_2023.pdf) (last accessed July 18, 2024).

104.    The agenda for this event included "case studies of several health systems using publicly available information" focusing on "expanded interpretation of the patient definition," among other things.  This session led immediately to a 60-minute cocktail reception and a 90-minute dinner.

105.    Given J&J's history of disparaging covered entities in public fora and documented opportunities to do so in private, Plaintiff is reasonably concerned that J&J will use any audit

results to irreparably injure its reputation in public or in communications with other 340B Program stakeholders.

106.    In addition, HRSA's unlawful audit approval decision will irreparably damage Plaintiff's legal standing if it avails itself of the process for challenging any findings from the manufacturer's audit.

107.    As part of its audit request, J&J submitted a "reasonable cause letter."

108.    HRSA evaluated this letter and, apparently, agreed that the documentation J&J provided, which documentation Plaintiff has never seen, shows "reasonable cause to believe that a violation…occurred[.]"  61 Fed. Reg. at 65,410.

109.    If the audit proceeds, Plaintiff is obligated to repay the manufacturer for noncompliant 340B drug use, if any.  If Plaintiff disagrees with Deloitte's findings by, for example, disagreeing with Deloitte's determination that a so-called "expanded interpretation of the patient definition" constitutes diversion, J&J's recourse is to file a petition with the HHS 340B Administrative Dispute Resolution Board seeking to compel Plaintiff's repayment.  42 C.F.R. § 10.21.

110.    J&J's petition would be heard by a panel selected by HRSA's Office of Pharmacy Affairs Director.

111.    HRSA's Office of Pharmacy Affairs director is also the official who twice informed Plaintiff that J&J had established reasonable cause to conduct an audit based on HRSA's *ex parte* review of materials supplied by J&J.

112.    Since HRSA declined to reconsider its initial decision, Plaintiff now faces the prospect of an ADR Panel where every possible member is supervised by an official who previously decided that J&J's claim has merit.

113.     To avoid this apparently inevitable conflict, Plaintiff requested that HRSA's decision be reconsidered by an official who was not involved in making the initial determination: "If you approved these audits in your role as OPA Director, we respectfully request that the reconsideration be performed by an independent official who was not involved in the initial decision."

114.     Plaintiff cannot file suit against J&J over its failure to follow the Manufacturer Audit Guidelines.  Under Supreme Court precedent, covered entities lack standing to sue manufacturers for noncompliance with 340B Program requirements, such as the Manufacturer Audit Guidelines.  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 120 (2011).

115.     Plaintiff's only protection runs through HRSA and this Court.

## COUNT 1

## (Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)

116.     MaineGeneral Medical Center repeats and realleges paragraphs 1 through 115 hereof, as if fully set forth herein.

117.     The APA prohibits HRSA from carrying out the agency's statutory and regulatory duties in a manner that is unlawful, arbitrary, capricious, an abuse of discretion, contrary to law, or without observance of procedure required by law. See 5 U.S.C. § 706(2).  HRSA's decision to authorize J&J's audit request, even though the manufacturer failed to provide the required written notice to Plaintiff, was arbitrary, capricious, and unlawful.

118.     HRSA's decision represents a final agency action for which Plaintiff has no other remedy at law.

119.     Plaintiff would be immediately and irreparably harmed if HRSA's decision were allowed to stand.

120.    The intent of Congress and the public interest will be served by an Order vacating HRSA's audit approval decision with respect to Plaintiff, declaring that the Manufacturer Audit Guidelines are binding and mandatory upon HRSA and manufacturers, and prohibiting HRSA from approving any proposed audit in the absence written notice and good-faith attempts to resolve the issue, as described in the Manufacturer Audit Guidelines.

**WHEREFORE**, MaineGeneral Medical Center prays for the following relief:

A.    A declaration pursuant to 28 U.S.C. § 2201 that the Manufacturer Audit Guidelines are binding and mandatory upon both the agency and manufacturers.

B.    An order vacating HRSA's decision to approve J&J's audit request with respect to Plaintiff on the grounds that the decision was arbitrary, capricious, contrary to law, and an abuse of discretion.

C.    Preliminary and permanent injunctive relief barring the Defendants and any entities acting in concert with them from initiating and/or pursuing any enforcement actions against Plaintiff in connection with J&J's proposed audits.

D.    An order awarding Plaintiff costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

E.    Such other and further relief that the Court deems just and proper.

Dated: July 24th, 2024

Respectfully submitted,

By: /s  James Junger

Tyler James Junger
DC Bar Identification Number: WI0036
jjunger@hallrender.com

Todd A. Nova (pro hac vice forthcoming)
tnova@hallrender.com
Hall, Render, Killian, Heath & Lyman, P.C.
330 East Kilbourn Avenue
Suite 1250
Milwaukee, WI  53202
(414) 721-0922

Brandon C. Helms (pro hac vice forthcoming)
bhelms@hallrender.com
Hall, Render, Killian, Heath & Lyman, P.C.
101 W. Big Beaver Road, Suite 745
Troy, MI 48084
(248) 457-7847

*Attorneys for Plaintiff MaineGeneral Medical Center*